**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:

GENCO SHIPPING & TRADING LIMITED, et al.,

                       Debtors.

: Chapter 11
:
: Bankr. Case No.: 14-11108
: (SHL)
:
:  (Jointly Administered)
:
:

-------------------------------------------------------- x

FISHER-PARK LANE OWNER LLC, et al.,

                       Appellants,

                       v.

GENCO SHIPPING & TRADING LIMITED, et al.,

                       Appellees.

:
: Case No.: 15-cv-05473
: (SAS)
:
: Related Docket No. 7
:
:
:
:

-------------------------------------------------------- x

### APPELLEES GENCO SHIPPING & TRADING LIMITED, ET AL.'S BRIEF IN OPPOSITION TO APPELLANTS <u>FISHER-PARK LANE OWNER, LLC, ET AL.'S OPENING BRIEF</u>

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Adam C. Rogoff
P. Bradley O'Neill
Natan Hamerman
Anupama Yerramalli

*Counsel for Appellees/Reorganized Debtors*
*Genco Shipping & Trading Limited, et al.*

Dated:      September 17, 2015
                New York, New York

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 8012 of the Federal Rules of Bankruptcy Procedure, Genco Shipping & Trading Limited ("**<u>Genco</u>**") is the parent corporation that owns all of the stock of the debtors (other than itself) in the above captioned bankruptcy cases.  There is no parent corporation or publicly held corporation that owns ten percent or more of the stock of Genco.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

SUMMARY OF ARGUMENT ............................................................... 1

STATEMENT OF THE CASE .............................................................. 3

       Appellants' Bankruptcy Claims ..................................................... 6

ARGUMENT ..................................................................................... 9

I.     THE BANKRUPTCY COURT PROPERLY HELD THAT THE FISHER ENTITIES DO NOT HAVE A CLAIM  FOR DAMAGES UNDER THE LEASE DOCUMENTS ........................... 9

     A.    The Language of the Lease Documents Supports Appellees' Position, Not Appellants' ....................................... 10

     B.    The Relevant Legal Authorities Support Appellees' Position ................................................................................ 12

          (i)    The Decision is Fully Supported by New York Law ...................................................................... 12

          (ii)   The Fisher Entities' Common Law Theories Are Inapposite ..................................................... 16

     C.    Rejection Does Not Automatically Equate to Damages ........... 17

II.    EVEN IF THIS COURT REVERSES, IT SHOULD REMAND FOR ISSUES RELATING TO DAMAGES ...................................... 20

CONCLUSION ................................................................................ 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bailey v. Fish & Neave*,
  8 N.Y.3d 523 (2007) ...........................................................................................16

*Duane Reade v. I.G. Second Generation Partners, L.P.*,
  280 A.D.2d 410 (1st Dep't 2001) .........................................................................15

*Health Insurance Plan of Greater New York v. Photobition New York, Inc.*,
  65 A.D.3d 401 (1st Dep't 2009) ..................................................................... *passim*

*Henry v. Lewis*,
  102 A.D.2d 430 (1st Dep't 1984) .........................................................................18

*L.J. Hooker International Florida, Inc. v. Gelina (In re Hooker Investments, Inc.)*,
  131 B.R. 922 (Bankr. S.D.N.Y. 1991) ..................................................................19

*Levine v. Yokell*,
  245 A.D.2d 138 (1st Dep't 1997) .........................................................................15

*Maska U.S., Inc. v. Kansa Gen. Ins. Co.*,
  198 F.3d 74 (2d Cir. 1999).................................................................................20

*Orthopaedic Assocs. Of Manhasset v. Michael Parisi & Son Constr. Co.*,
  2003 N.Y. Misc. LEXIS 75 (N.Y. Sup. Ct. Jan. 24, 2003)...................................15

**Statutes**

11 U.S.C. § 365(g)(1) ...........................................................................................18

11 U.S.C. § 502....................................................................................................19

**Other Authorities**

11 Corbin on Contracts § 55.1 (Rev. Ed. 2005)........................................................17

Rasch's Landlord and Tenant § 28:76 ....................................................................17

Appellees Genco Shipping & Trading Limited ("**Genco**") and certain of its subsidiaries, as reorganized debtors-in-possession (collectively, "**Appellees**") submit this brief in opposition to the appeal of Fisher Brothers Management Co. LLC ("**Fisher Management**") and Fisher-Park Lane Owner LLC ("**Fisher-Park**," and together with Fisher Management, the "**Fisher Entities**" or "**Appellants**") from the Opinion (the "**Decision**") [Bankr. Docket No. 489] and Order (the "**Order**") [Bankr. Docket No. 499] of the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") disallowing and expunging with prejudice Appellants' proofs of claim filed in Appellees' bankruptcy cases.[1]

## SUMMARY OF ARGUMENT

1.      Before its bankruptcy, Genco leased office space on Park Avenue from Fisher-Park.  In 2012, it moved to a different floor in the same building and subleased the original space to an affiliate of Fisher-Park, Fisher Management, at a lower rent than Genco was paying Fisher-Park.  At the time of the Sublease (defined below), the parties anticipated that the Master Lease (also defined below) between Genco and Fisher-Park might end early and expressly agreed that Fisher Management would be permitted to remain in possession of the subleased space so long as it paid the full rent under the Master Lease to Fisher-Park, rather than the reduced rent that it had paid to Genco.  Importantly, the

---

[1] "Bankr. Docket No." refers to Genco Shipping & Trading Limited, et al., case no. 14-11108 (SHL) (jointly administered) and "Docket No." refers to the docket in this case, 15-cv-05473 (SAS).

Sublease expressly provided that Genco would not be liable to Fisher Management for the early termination of the Sublease as a result of termination of the Master Lease.

2.    In April 2014, Genco filed a bankruptcy case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Shortly thereafter, the Bankruptcy Court granted Genco's motion to reject the Master Lease, the Sublease and certain related agreements.  Fisher Management remained in the office space post-rejection, paying Fisher-Park the full rent that had been due under the Master Lease, rather than the reduced amount under the Sublease.  Both Fisher Management and Fisher-Park filed claims against Genco's estate arising out of the rejection.  Notwithstanding the express terms of the Sublease and related documents, Fisher Management seeks from Genco the amount of the increased rent it is now paying to its affiliate.  Although it was collecting the full amount due under the Master Lease from Fisher Management, Fisher-Park also asserted a claim against Genco.

3.    As the Bankruptcy Court correctly held, both Fisher Entities received the benefit of their negotiated bargains, and, under the plain terms of the governing documents, are not entitled to damages.  Furthermore, New York appellate authority on which the Bankruptcy Court properly relied, *Health Insurance Plan of Greater New York v. Photobition New York, Inc.*, 65 A.D.3d 401 (1st Dep't 2009), dictates that a subtenant who agrees that, notwithstanding the termination of the sublessor's interest in the property, it will retain possession of

the premises in exchange for paying a higher rent, has no claim against its sublessor.  *Id.* at 404-05.

4.      Remarkably, in the face of these facts and the Bankruptcy Court's careful ruling, Appellants continue to ignore the relevant provisions of the Lease Documents (defined below), fail meaningfully to distinguish the authority on which the Bankruptcy Court relied, and instead stress inapposite cases or concepts that have no bearing on this dispute.  They also assert that, as a matter of bankruptcy law, they are entitled to damages simply by virtue of the "rejection" of their leases.  This is incorrect.  The Bankruptcy Code does not automatically entitle parties to an allowed claim; proof of damages is absolutely required.

5.      For all of these reasons, the Decision and Order should be affirmed.

## **STATEMENT OF THE CASE**

*The Salient Provisions of the Lease Documents*

6.      The facts relevant to this appeal are undisputed.[2]  In 2005, Genco leased office space located on the 20th floor of 299 Park Avenue from Fisher-Park, which it used as its international headquarters.  The terms of the lease were set forth in an Agreement dated September 22, 2005 (the "**Master Lease**") *See* Bankr. Docket No.462 at Exhibit 2.

7.      Although the term of the Master Lease did not expire until 2021, in January 2012, Appellees vacated the 20th floor and moved their

---

[2] *See* Decision at 2.  As such, the standard of review is *de novo*.

headquarters to larger space on the 12th floor of the same building.   Genco subsequently sub-leased the 20th floor space to Fisher Management (an affiliate of Fisher-Park) pursuant to a Sublease dated November 1, 2013 (the "**Sublease**"). *See* Bankr. Docket No. 462 at Exhibit 3.  The annual rent payable to Genco under the Sublease was approximately $178,000 – or approximately 40% – less than the annual rent it paid to Fisher-Park under the Master Lease.  This rent difference was known to all parties at the time.

8.     The Sublease expressly contemplated that the leases might end early, and provided that Genco would have no liability for that occurrence. Specifically, the Sublease provides that:

> If the [Master Lease] shall terminate for any reason this Sublease shall also terminate as of the date of termination of the [Master Lease], unless [Fisher-Park] otherwise agrees, *and in no event shall [Genco] be liable therefor*.

Sublease § 5.1 (emphasis added).   It further contemplated that Genco could voluntarily terminate the Master Lease if Fisher Management obtained Fisher-Park's consent to continue to occupy the space on the 20th floor.

> Notwithstanding the foregoing, [Genco] may otherwise voluntarily terminate the [Master Lease] without [Fisher Management's] consent if [Fisher-Park] agrees to assume and accept this Sublease in order to permit [Fisher Management] to remain in possession of the [s]ubleased [p]remises as a direct tenant for the remainder of the term of the Sublease or pursuant to a new direct lease between [Fisher-Park] and [Fisher Management].

*Id.*

9.     At the same time the parties' entered the Sublease, Genco, Fisher-Park, and Fisher Management also entered into (i) a letter agreement, pursuant to which, *inter alia*, Fisher-Park consented to the Sublease (the "**Consent**") and (ii) a Subordination, Nondisturbance and Attornment Agreement dated November 1, 2013 (the "**SNDA Agreement**," together with the Master Lease, Sublease, and Consent, the "**Lease Documents**"). (Copies of the Sublease, Consent and SNDA Agreement can be found at Exhibit 3 to Bankr. Docket No. 462). Significantly, Fisher Management's entry into the Sublease was premised upon the simultaneous execution of the SNDA Agreement and the Consent. The SNDA Agreement expressly provides that:

> [Fisher Management] was unwilling to enter into the Sublease absent [Fisher-Park's] execution of [the SNDA Agreement] and that certain consent . . . dated the date hereof between [Fisher-Park, Genco and Fisher Management] pursuant to which [Fisher-Park] has consented to the Sublease.

*See* SNDA Agreement at Recital ¶ 3.

10.     Consistent with Section 5.1 of the Sublease, the SNDA Agreement further specified that, if the Master Lease terminated, Fisher Management would remain in possession of the 20th floor space as a direct tenant of Fisher-Park *in exchange for its agreement to pay the same amount of rent as provided for under the Master Lease*. In particular:

> [Fisher Management's] subleasehold estate in the [20th Floor Space] shall not be terminated or disturbed and the Sublease shall continue in full force and effect with respect to the Subleased Premises as a direct lease between [Fisher Management] and [Fisher-Park] upon all

> of the same terms, covenants, conditions and obligations
> of the Sublease (subject, however, to the other provisions
> of this Agreement) relative to the [20th Floor Space] only,
> for the balance of the term thereof with the same force as
> if the Sublease were a direct lease between [Fisher-Park]
> and [Fisher Management]; *provided, however, that,*
> *commencing on the [date on which Fisher Management*
> *attorns to Fisher-Park and Fisher-Park recognizes the*
> *tenancy of Fisher Management], [Fisher Management]*
> *shall pay the greater of (x) the fixed annual rent and*
> *additional rent as provided in the Sublease, or (y) the*
> *fixed annual rent and additional rent as provided in the*
> *[Master Lease].*

SNDA Agreement § 2(b) (emphasis added). Tellingly, while the parties

specifically agreed that Fisher Management would pay Fisher-Park the higher rent

required by the Master Lease, the SNDA Agreement does not obligate Genco to

reimburse or otherwise compensate Fisher Management for that increase. Indeed,

as noted, the Sublease expressly absolves Genco of liability for termination of the

Sublease.

*Appellants' Bankruptcy Claims*

11.   On April 21, 2014, Genco and the other Appellees each

commenced bankruptcy cases under title 11 of the Bankruptcy Code.

12.   On the same date, Genco filed a motion to reject the Lease

Documents. *See* Bankr. Docket No. 17. Appellants did not oppose the motion.

After a hearing, the Bankruptcy Court granted that Motion and entered an order,

dated May 16, 2014, approving the rejection (the "**Lease Rejection Order**"). *See*

Bankr. Docket No. 174 at 3. Appellants signed and expressly consented to the

Lease Rejection Order. *See id.* The Lease Rejection Order formally terminated the

Lease Documents and set a deadline for the Fisher Entities to file proofs of claim for any alleged damages. *Id.* at 3.

13.   On May 20, 2014, Fisher-Park filed a proof of claim seeking unpaid rent as a consequence of the rejection of the Master Lease (the "**Master Lease Claim**").   As the Bankruptcy Court recognized, Fisher Management was (and still is) paying the full rent.   Decision at 5.   Rather, Fisher-Park's claim asserted that it "may incur damages resulting from the termination of the [Master] Lease, the amount of which cannot presently be ascertained."   *See* Bankr. Docket No. 462 at Exhibit 4.   Fisher-Park further conceded that any recovery it might obtain as a consequence of its Master Lease Claim would be subject to section 502(b)(6) of the Bankruptcy Code – a statutory cap on the amount of potential damages a landlord can claim from the termination of a real property lease.   *See id.; see also infra* ¶ 41.

14.   On the same day, Fisher Management filed a proof of claim seeking $1,614,130.33 in alleged damages.   This amount was calculated as the amount of additional rent that it is required to pay under the SNDA Agreement for continued occupancy of the premises over the amount it had paid under the Sublease, discounted at an annual rate of 3% (the "**Sublease Claim**" and, together with the Master Lease Claim, the "**Lease Claims**").   *See* Bankr. Docket No. 462 at Exhibit 5.

15.   Genco objected to the Lease Claims on March 13, 2015.   The Fisher Entities responded on April 2, 2015, *see* Bankr. Docket No. 467

("**Response**") and the Appellees filed their reply on April 24, 2015, *see* Bankr. Docket No. 481.

16.     On April 28, 2015, the Bankruptcy Court heard oral argument on the Objection.  On May 21, 2015, the Bankruptcy Court issued its Decision disallowing both of Appellants' claims in their entirety.  *See* Bankr. Docket No. 489.  The Bankruptcy Court held that Fisher-Park had not suffered any damages because it had continued to receive from Fisher Management the full rental amount previously paid by Genco.  Decision at 5.

17.     The Bankruptcy Court also found that Fisher Management did not have a damage claim because it had received exactly what it had bargained for under the Lease Documents – "the benefit of undisturbed occupancy, rather than face potential eviction . . . ."  Decision at 6.  Under the salient provisions of the Lease Documents, including Sublease Section 5.1 and SNDA Agreement Section 2, the Bankruptcy Court held, Genco was not obligated to continue to pay Fisher Management the difference in rent following termination of the Sublease. Decision at 8.

18.     The Bankruptcy Court reviewed the cases cited by Genco and Appellants, and correctly concluded that Genco's authorities governed this situation.   In particular, it found that this dispute paralleled that in *Health Insurance*, where the Appellate Division found that a subtenant had incurred no damage when it consented to paying increased rent to its over-landlord if its sublessor's prime tenancy ended early.  *Id.*  The Bankruptcy Court further found

that Appellants' authorities were not on-point and thus provided no support for Appellants' position. *Id.*

19.     The Bankruptcy Court also rejected each of the arguments that Appellants presented below.  For example, Appellants had argued that the Lease Documents were silent on whether they were entitled to damages, but based on Section 5.1 of the Sublease and Section of the SNDA, the Bankruptcy Court disagreed.  The Bankruptcy Court similarly disposed of Appellants' argument that Sublease Section 5.1 was limited to specific circumstances such as subordination, and instead found that the language made explicit that Genco bore no liability upon ending its tenancy regardless of the reason.  Decision at 8-9.

20.     Thereafter, on June 3, 2015, the Court entered the Order formally disallowing and expunging the Lease Claims in their entirety with prejudice.  *See* Bankr. Docket No. 499.  This appeal followed.[3]

## ARGUMENT

## I.     THE BANKRUPTCY COURT PROPERLY HELD THAT THE FISHER ENTITIES DO NOT HAVE A CLAIM FOR DAMAGES UNDER THE LEASE DOCUMENTS

21.     The Bankruptcy Court disallowed Appellants' Claims because, under the plain terms of the Lease Documents, rejection of those agreements does not give Appellants a claim for damages.  Because, after rejection, the Fisher Entities received the full benefit of their bargain – assurance of uninterrupted

---

[3] On July 2, 2014, the Court entered an order confirming Genco's plan of reorganization [Bankr. Docket No. 322], which was substantially consummated on July 9, 2014.

occupancy for the subtenant, Fisher Management, and payment of the Master Lease rent for the landlord, Fisher-Park – the Bankruptcy Court's Decision and Order should be affirmed.

### A. The Language of the Lease Documents Supports Appellees' Position, Not Appellants'

22.    At the time the parties negotiated the Lease Documents, all three agreed what would occur if Genco's tenancy ended early.   Fisher Management would retain undisturbed occupancy, but would pay Fisher-Park the higher rental rate specified in the Lease Documents.  The order approving rejection of the Lease Agreements terminated Genco's tenancy and thus caused this contemplated contingency to occur.  In these circumstances, the Bankruptcy Court properly concluded that Appellants had received the full benefit of their bargain under the Lease Agreements and disallowed their claims for damages.

23.    In particular, Section 2 of the SNDA Agreement provides that upon the termination of the Lease Agreement, Fisher Management would retain its right of occupancy, but would be required to pay Fisher-Park the greater of the rent due under the Sublease or the Master Agreement.  This is precisely what happened. Fisher-Park continues to receive the full, undiscounted rent in respect of the premises, and Fisher Management maintains undisturbed possession of the

property.  In short, both Appellants have received the benefit of their bargain and have no claim for breach.[4]

24.     Even if they could make out such a claim – and they cannot – neither Appellant could establish damages.  Fisher-Park has been paid in full. Similarly, "Fisher Management has no claim for damages from now having to pay the full prime lease rent because that is precisely what it agreed to in the SNDA to obtain the benefit of undisturbed occupancy."  Decision at 6.  Nowhere does the SNDA Agreement grant Fisher Management a right to compensation from Genco for this change.  In fact, Section 5.1 of the Sublease expressly absolves Genco of any such liability, providing that "[i]f the [Master Lease] shall terminate for any reason this Sublease shall also terminate as of the date of termination of the [Master Lease], unless [Fisher-Park] otherwise agrees, *and in no event shall [Genco] be liable therefor*."[5]

---

[4]On page ten of their brief, Appellants bizarrely claim that Fisher Management is a "third-party beneficiary of the SNDA."  Fisher Management is a direct party to the SNDA Agreement, not a third party.  *See* Exhibit 3 to Bankr. Docket No. 462.  And while the SNDA Agreement provides Fisher Management with certain benefits, such as a continued right to occupancy after termination of the Master Lease, it also imposes various obligations on Fisher Management, such as the obligation to pay the full rent to Fisher-Park.  *See* SNDA Agreement at § 2(b).

[5]The same provision also permitted Genco to "voluntarily terminate the [Master Lease] without [Fisher Management's] consent if [Fisher-Park] agrees to assume and accept this Sublease in order to permit [Fisher Management] to remain in possession of the [20th Floor Space] as a direct tenant for the remainder of the term of the Sublease or pursuant to a new direct lease between [Fisher-Park] and [Fisher Management]."  That is precisely what occurred.  Section 5.1 of the Sublease is consistent with the SNDA Agreement that outlines the circumstances under which a contractual relationship between the Fisher Entities for the 20th floor space continues.  The Fisher Entities, by signing the SNDA Agreement, provided the "consent" contemplated by Section 5.1 of the Sublease, allowing Fisher Management to retain undisturbed possession despite cessation of Genco's direct occupancy rights.  Accordingly, the plain words of the Lease Documents contradict the Fisher Entities' claims.

25.     The Fisher Entities' sole response to the plain meaning of these provisions is to assert that Section 5.1 is limited to "deal[ing] with the subordination of the Sublease to any leases, mortgages and other rights or encumbrances to which the [Master] Lease itself was subject and subordinate." Appellants' Brief at 11.  But nothing in the Sublease, the SNDA Agreement or the other Lease Documents indicates that such a limitation exists.  To the contrary, it says Genco will have no liability if the leases terminate "for any reason."  *See* Sublease at § 5.1 *See* Exhibit 3 to Bankr. Docket No. 462.  Accordingly, the Bankruptcy Court correctly declined to adopt any such limitation.  Decision at 8.

### B.     The Relevant Legal Authorities Support Appellees' Position

#### (i)     The Decision is Fully Supported by New York Law

26.     Contrary to the Fisher Entities' suggestion that no dispositive case law exists (Appellants' Brief at 12), the First Department's decision in *Health Insurance Plan of Greater New York v. Photobition New York, Inc.*, 65 A.D.3d 401 (1st Dep't 2009), holds that where a subtenant, like Fisher Management, agrees to increased rental payments as a condition for remaining in possession once the prime tenant's tenancy ends, the subtenant has no damage claim for the increase. *Id.* at 405.

27.     In *Health Insurance*, like here, the sublandlord sublet space at a rate below what it was paying to its over-landlord.  The subtenant, sublandlord and over-landlord entered into an agreement providing that if the underlying lease terminated, the subtenancy would not be disturbed and the subtenant would assume

the obligation to pay an increased rent to the over-landlord. *Id.* at 402. After the sublandlord surrendered its leasehold interest, the subtenant eventually paid the increased rent to the over-landlord and commenced suit against the former sublandlord (among others) asserting breach of the sublease. *Id.* at 403. The Appellate Division found that the subtenant was not damaged and could not show that it was "adversely affected" within the meaning of the sublease because it "consented to pay the higher amount . . . ." *Id.* at 405. The Bankruptcy Court properly followed *Health Insurance* because, like the subtenant in *Health Insurance*, Fisher Management agreed in advance to pay the increased rent as a condition to obtaining continued occupancy of the premises upon termination of Genco's tenancy. Thus, having obtained the benefit of its contractual bargain, it suffered no damages. Decision at 8. Nor has Fisher-Park suffered any damages because it continues to receive its full rent. *Id.* at 5.

28.     The Fisher Entities try to distinguish *Health Insurance* by arguing that it was not a bankruptcy case and did not involve a rejection. Appellants' Brief at 15. The Bankruptcy Court's decision did not, however, turn on bankruptcy law. Rather, the Court applied New York law because the Lease Documents are expressly governed by New York law. *See* Master Lease at ¶ 41.6; Sublease at ¶ 17.3; SNDA Agreement at ¶ 9. *See also infra* Section I.C. (showing that rejection of a contract does not create an automatic right to damages under bankruptcy law). While the Lease Rejection Order expressly terminated the Lease

Documents, nowhere did the Bankruptcy Court suggest that bankruptcy law determines Appellants' rights after termination.[6]

29.   Nor is there any reason to dismiss *Health Insurance* as premised on "bad facts" or establishing "bad law."  Appellants' Brief at 15.  Far from misapplying the law, the Appellate Division followed one of the most basic and fundamental principles of contract law – contracts should be enforced in accordance with their terms.  There, as in this case, the subtenant consented to pay the additional rent to obtain the benefit of continued occupancy of the premises.  Black letter contract law therefore dictated that it had no claim for damages when that contract was performed.

30.   Nor is *Health Insurance* the only decision that supports Genco's position.  The law is clear that a claim for breach of contract will not lie where, as here, a contractually anticipated contingency – *i.e.*, Genco's tenancy ending early – materializes.  *See, e.g. Levine v. Yokell*, 245 A.D.2d 138, 139 (1st Dep't 1997) (finding that a tortious interference with contract claim against landlord was properly dismissed when landlord's refusal to consent to plaintiff's application was "a contingency specifically contemplated in the contract"); *Duane Reade v. I.G. Second Generation Partners, L.P.*, 280 A.D.2d 410, 412 (1st Dep't 2001) (finding "no basis" to impose liability on sublandlord for breach of contract

---

[6] Appellants' proffered "distinction" of *Health Insurance* is disingenuous.  They themselves rely on New York and other non-bankruptcy law.  *See* Appellants' Brief at 9-11.  However, as discussed below, their authorities are inapposite.

where contingency prevented the creation of a sublease); *see also* Decision at 9. Appellants cite no case law or other authority to the contrary.

31.    Additionally, Courts will not impose terms that are not part of a written agreement, particularly when drafted by experienced attorneys. *Orthopaedic Assocs. Of Manhasset v. Michael Parisi & Son Constr. Co.*, 13309-02, 2003 N.Y. Misc. LEXIS 75, *9-10 (N.Y. Sup. Ct. Jan. 24, 2003) (stating that where "lease terms were negotiated by experienced attorneys and business persons, there is no basis 'to interpret an agreement as impliedly stating something which the parties have neglected to specifically include'" and noting that "parties are free to make their contracts and courts do not serve as business arbiters between parties in approximately equal stances.") (quotations omitted); *see also Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("[W]hen parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.") (quotations omitted).

32.    Here, the Fisher Entities and Genco agreed upon what would occur if Genco's tenancy ended early – an event that, absent an agreement, could have otherwise ended Fisher Management's right to possession.   Fisher Management specifically negotiated for continued occupancy of the 20th floor in exchange for paying increased rent to Fisher-Park.   Now, this planned-for contingency has come to pass.  And, just like *Health Insurance*, the Fisher Entities received everything they bargained for and should not be deemed damaged by the occurrence of this planned contingency.  The Fisher Entities admit that but for the

SNDA Agreement "Fisher Management would have been at risk of losing its right of possession."  Appellants' Brief at 10.  In other words, the Fisher Entities are happy to keep the benefit of their bargain (continued occupancy of the 20th floor), but want to offload the negotiated increase in rent to Genco.  The Fisher Entities should be bound by the terms of the negotiated Lease Documents, which should not now be rewritten for the Fisher Entities' exclusive benefit.

> ### (ii)     The Fisher Entities' Common Law Theories Are Inapposite

33.     Unable to muster any cases that support their meritless position, Appellants instead reference various general common law doctrines, none of which is applicable here.  First, the Fisher Entities cite *Corbin on Contracts* § 55.1 for the concept that a breaching party owes damages to a counterparty.  Appellants' Brief at 9.  However, this unremarkable proposition does not govern the situation here, where Fisher Management *agreed in advance* to pay the full rent to Fisher-Park once Genco's tenancy ceased.  In fact, the Bankruptcy Court appropriately rejected the Fisher Entities reliance on this authority noting "a party is not entitled to contract damages where, as here, a contingency was contemplated and addressed by an agreement negotiated by the parties."  Decision at 9.  The Fisher Entities ignore this well-reasoned conclusion.

34.     Next, the Fisher Entities cite *Rasch's Landlord and Tenant* § 28:76 for the notion that a wrongfully evicted tenant can recover damages equal to "the difference between the actual rental value of the premises at the time of eviction and the agreed rent for the unexpired portion of the term."  Appellants'

Brief at 11 (citation omitted).  The Fisher Entities assert that, "by analogy, the damages suffered by Fisher Management should be the same as they would have been had it been evicted from its subleased premises." *Id.*  But, as the Bankruptcy Court recognized, Fisher Management was not evicted.  In fact, by virtue of its contract right, it continues to lease and occupy the 20th floor space by paying the agreed rent to the prime landlord.  Decision at 9.  Again, the Fisher Entities ignore this distinction.

35.     Finally, the Fisher Entities cite, *Henry v. Lewis*, 102 A.D.2d 430, 435 (1st Dep't 1984), for the argument that a contractual waiver is limited to its express terms and is strictly construed.  Appellants' Brief at 9-10.  However, as the Bankruptcy Court noted, this dispute is not about waivers.  Rather, the case turns on Fisher Management's specific agreement that it would pay to Fisher-Park the higher rent to continue undisturbed possession.[7]  Thus, the Bankruptcy Court aptly focused on the language of the Lease Documents to conclude that no damages occurred and this dispute is not premised upon any waiver.  Decision at 9.  Accordingly, the three common law theories the Fisher Entities cite have no application to the facts here.

### C.     Rejection Does Not Automatically Equate to Damages

36.     Appellants also misread Bankruptcy Code section 365(g) to argue that rejection of the Lease Documents *automatically* gave rise to a claim for

---

[7] Moreover, *Henry* involved the waiver of a physician-patient privilege under the New York Civil Practice Law and Rules and has no bearing on this case.  *See Henry*, 102. A.D.2d at 431.

damages.  The introductory clause of section 365(g) of the Bankruptcy Code does indeed state that "the rejection of an . . . unexpired lease of the debtor constitutes a breach of such . . . lease."  11 U.S.C. § 365(g).  Appellants' Brief at 7.  But Appellants gloss over the balance of section 365 – which addresses the *timing* of the breach, specifying that it would only be deemed to occur "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1).  In other words, section 365(g) mandates that any rejection claim is to be treated as if it occurred prepetition, and therefore receives a lower priority than a claim arising out of the administration of the bankruptcy case after the filing of the petition.

37.    More importantly, section 365(g) says nothing about whether a claim will be allowed or in what amount.  Unsecured proofs of claim are deemed allowed until they are objected to.  *See* 11 U.S.C. § 502(a).  Upon an objection, the Bankruptcy Court then holds a hearing and determines whether to allow the claim and, if so, in what amount.  *See id.* at 502(b)(1) (court will determine the amount of the claim unless "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law").

38.    The same approach applies to rejection damage claims.  "While § 365(g) allows the nondebtor party the right to file a prepetition claim, that section does not give rise to an irrebuttable presumption that the claim is valid. *L.J. Hooker International Florida, Inc. v. Gelina (In re Hooker Investments, Inc.)*, 131 B.R. 922, 928 (Bankr. S.D.N.Y. 1991).  Rather, "the rejection claim is subject to disallowance under §§ 502(g) and 502(b)(1) to the extent that it is unenforceable

against property of the debtor." *Id.*   In fact, Bankruptcy Code section 502(g) expressly provides for the disallowance of rejection damage claims:

> "[a] claim arising from the rejection, under section 365. . .of an unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed. . .*or disallowed*" under the relevant provision of section 502, including section 502(b)(1).

11 U.S.C. § 502(g) (emphasis added).

39.   Appellants also criticize the Bankruptcy Court for failing to mention the word breach.  Appellants' Brief at 7.  However, that the Bankruptcy Court did not use that specific word is not particularly meaningful, as the issue before the Bankruptcy Court was whether the rejection caused damages.[8]

40.   In short, section 365(g) of the Bankruptcy Code simply creates another species of prepetition claim that is subject to dispute by all parties and allowance or disallowance by the Bankruptcy Court.  Nothing in that section grants an automatic allowed claim upon rejection, let alone dictates the amount of such a claim.[9]

---

[8] Appellants also assert that the Lease Documents were rejected "without the[ir] consent," Appellants' Brief at 15.  Despite their contentions, however, the Fisher Entities had an opportunity to object to Genco's motion to reject the Lease Documents and did not do so.  Indeed, they actually negotiated and consented to the Lease Rejection Order which granted the rejection and terminated Genco's prime tenancy.  *See* Lease Rejection Order at 3.

[9] In their opening brief, Appellants advanced a new argument on appeal: that the Appellees' objection to paying the Fisher Entities is somehow contradicted by Appellees' "First Day Declaration," in which the Appellees expressed their intent, as part of their financial restructuring, to pay their operational creditors.  This new appellate argument was not raised before the Bankruptcy Court, is not preserved, and should be dismissed.  *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 79-80 (2d Cir. 1999) ("it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal") (citations omitted).  This argument is meritless in any case.  Appellees' desire to pay operational creditors

## II.   EVEN IF THIS COURT REVERSES, IT SHOULD REMAND FOR ISSUES RELATING TO DAMAGES

41.   Because the Bankruptcy Court disallowed Fisher Management's claim, it did not address certain issues raised by Fisher Management relating to calculation of its alleged damages.   First, Fisher Management argues that its damages, if any, should not be capped pursuant to section 502(b)(6) of the Bankruptcy Code (which caps a landlord's damages for rent under the lease, without acceleration, at the greater of one year or 15% (not to exceed three years) for the remainder of the lease.)   11 U.S.C. § 502(b)(6).   The Bankruptcy Court found that, because Fisher Management had no claim, "the [Bankruptcy] Court does not need to address the [statutory cap] question." Decision at 9.   Rather than deciding this for the first time on appeal, if the Court finds that Fisher Management does have a claim, it should remand to determine whether the statutory cap should apply to Fisher Management's claim.[10]

---

does not mean that they would (or even could) pay parties, like the Fisher Entities, who have no valid claim because they were not damaged by Appellees' conduct.

[10] If the Court does not remand, and decides that it (rather than the Bankruptcy Court) should determine this question in the first instance, it should rule that the statutory cap does apply to Fisher Management's claim, contrary to Appellants' argument.   The Fisher Entities made clear that "the claim of [Fisher-Park] was concededly filed for protective purposes only.   It was never intended to duplicate the claim of Fisher Management . . .   and a damage claim exists, whether it be in favor of Fisher Management or [Fisher-Park]."   Appellants' Brief at 16.   Thus, the Fisher Entities treat their claims as interchangeable.   Fisher-Park's claim, however, is undoubtedly subject to the Statutory Cap.   Indeed, even Fisher-Park concedes as much.   *See* Exhibit 4 of Bankr. Docket No. 462.   It would be inequitable and contradicts the purpose of the Bankruptcy Code to allow Fisher Management to maintain an uncapped claim when that claim, if asserted by Fisher-Park, would be subject to the statutory cap and significantly smaller.   This result creates an end-run around the statutory cap that should not be allowed.   Accordingly, if Fisher Management's claim is allowed, and if the Court does not remand to the Bankruptcy Court for further proceedings, it should apply the statutory cap.

42.     Second, the parties also disputed the appropriate discount rate to apply to Fisher Management's claim, if allowed.  The Bankruptcy Court found that this issue also need not be addressed because the Fisher Entities were not damaged.  If this Court reverses the Decision, this question will also need to be remanded, and involves disputed issues of fact.  Fisher Management did not provide any justification to the Bankruptcy Court for the discount rate that it applied to its claim, merely contending that it is "appropriate by any objective standard."  *See* Bankr. Docket No. 467 at ¶ 14.  Genco maintained that a much higher discount rate should be applied if a claim is granted.  Because the Bankruptcy Court found that the Fisher Entities claims should be disallowed, this factual question was also never decided.

## CONCLUSION

43.     Neither of the Fisher Entities has been damaged.  The Fisher Entities contracted for a contingency that materialized and have since received the benefit of their bargain.  The Fisher Entities should be held to that bargain, and their claims should be expunged.  For the foregoing reasons, the Decision and Order of the Bankruptcy Court should be affirmed in its entirety.

Dated:  September 17, 2015
        New York, New York


                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                        /s/ Natan Hamerman
                        Adam C. Rogoff (arogoff@kramerlevin.com)
                        P. Bradley O'Neill (boneill@kramerlevin.com)
                        Natan Hamerman (nhamerman@kramerlevin.com)
                        Anupama Yerramalli (ayerramalli@kramerlevin.com)
                        1177 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 715-9100

                        *Counsel for the Appellees*
                        *Genco Shipping & Trading Limited, et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. Bank. P. 8015(a)(7)(B) because it contains 6,211 words, excluding the parts of the brief exempted by Fed. R. Bank. P. 8015(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. Bank. P. 8015(a)(5)(A) and the type style requirements of Fed. R. Bankr. P. 8015(a)(6) because the brief has been prepared using a proportionally spaced typeface on Microsoft Word 2010 in 14-point Times New Roman.


Dated: New York, New York
     September 17, 2015

                                         By:   /s/  Natan Hamerman
                                                Natan Hamerman