UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

In re

GENCO SHIPPING & TRADING LIMITED,
*et al.*,

                                      Reorganized Debtors.

------------------------------------------------------------- X

FISHER BROTHERS MANAGEMENT CO.
LLC and FISHER-PARK LANE OWNER LLC,

                                      Appellants,

                           v.

GENCO SHIPPING & TRADING LIMITED, *et al.*,

                                      Appellees.

------------------------------------------------------------- X

### OPINION AND ORDER

Appeals arising from
Case No. 14-11108
(Jointly Administered)

15-cv-5473 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

        This is an appeal from an order entered in the jointly administered chapter 11 bankruptcy cases of appellees Genco Shipping & Trading Limited and related entities (together, "Genco") disallowing the claims of appellants Fisher Brothers Management Co. LLC ("Fisher Management") and Fisher-Park Lane

1

Owner LLC ("Fisher-Park"). For the reasons set forth below, the Bankruptcy Court's order disallowing appellants' claims is VACATED and this matter is REMANDED to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.

## I.   BACKGROUND

### A.   The Lease Documents

The facts relevant to this appeal are undisputed. Pursuant to a Master Lease dated September 22, 2005, Genco leased office space on the twentieth floor of 299 Park Avenue from Fisher-Park.[1] In January 2012, Genco vacated the twentieth floor and moved its headquarters to the twelfth floor of the same building.[2] Under a Sublease dated November 1, 2013, Genco subleased the twentieth-floor office space to Fisher Management. The annual rent payable to Genco under the Sublease was less than the annual rent Genco paid to Fisher-Park under the Master Lease.[3]

Section 5.1 of the Sublease provides that, "[i]f the [Master Lease]

---

[1]   *See* Brief of Appellants Fisher Brothers Management Co. LLC and Fisher-Park Lane Owner LLC ("Mem."), at 3.

[2]   *See id.*

[3]   *See id.*

shall terminate for any reason this Sublease shall also terminate as of the date of termination of the [Master Lease], unless [Fisher-Park] otherwise agrees, and in no event shall [Genco] be liable therefor." Section 5.1 also states that:

> Notwithstanding the foregoing, [Genco] may otherwise voluntarily terminate the [Master Lease] without [Fisher Management's] consent if [Fisher-Park] agrees to assume and accept this Sublease in order to permit [Fisher Management] to remain in possession of the Subleased [p]remises as a direct tenant for the remainder of the term of the Sublease or pursuant to a new direct lease between [Fisher-Park] and [Fisher Management].

The same day the Sublease was executed, Genco, Fisher-Park, and Fisher Management entered into a consent to the Sublease (the "Consent") and a Subordination, Nondisturbance, and Attornment Agreement (the "SNDA Agreement"; together with the Master Lease, Sublease, and Consent, the "Lease Documents"). Recital 3 of the SNDA Agreement states that Fisher Management "was unwilling to enter into the Sublease absent [Fisher-Park's] execution of [the SNDA Agreement] and [the C]onsent . . . pursuant to which [Fisher-Park] has consented to the Sublease." Section 2(b) of the SNDA provides that:

> In the event the [Master] Lease terminates for any reason other than (i) the occurrence of a casualty or condemnation that results in the exercise by [Fisher-Park] of a termination right under the [Master] Lease or (ii) a default by [Fisher Management] or breach of [Fisher Management's] obligations under the Sublease, then so long as [Fisher Management] is not then in default in the

3

> performance of any of its obligations under the Sublease . . . .
>
> [Fisher Management's] subleasehold estate in the [twentieth floor] shall not be terminated or disturbed and the Sublease shall continue in full force and effect with respect to the Subleased Premises as a direct lease between [Fisher Management] and [Fisher-Park] upon all of the same terms, covenants, conditions and obligations of the Sublease (subject, however, to the other provisions of this Agreement) relative to the [twentieth floor] only, for the balance of the term thereof with the same force as if the Sublease were a direct lease between [Fisher-Park] and [Fisher Management]; provided, however, that, commencing on the [date on which Fisher Management attorns to Fisher-Park and Fisher-Park recognizes the tenancy of Fisher Management], [Fisher Management] shall pay the greater of (x) the fixed annual rent and additional rent as provided in the Sublease, or (y) the fixed annual rent and additional rent as provided in the [Master Lease].

### B.   Appellants' Claims

On April 21, 2014, Genco commenced a chapter 11 bankruptcy case. That same day, Genco filed a motion to reject the Lease Documents.[4] After a hearing, the Bankruptcy Court entered an order approving the rejection (the "Lease Rejection Order").[5] This order was entered on consent of appellants.[6]

---

[4]   *See* Bankr. Dkt. No. 17.

[5]   *See* Bankr. Dkt. No. 174.

[6]   The Lease Rejection Order explicitly resolved prepetition rent claims. *See id.* ¶ 2 ("For the rent obligations for the period May 1, 2014 to and including May 14, 2014 . . . due and payable under the Master Lease and Sublease, as applicable, (a) the applicable Debtor will be responsible to Fisher-Park for its

On May 20, 2014, Fisher-Park filed a proof of claim seeking an unspecified amount of unpaid rent as a consequence of the rejection of the Master Lease. That same day, Fisher Management filed a proof of claim seeking $1,614,130.33 in damages based on the additional rent it was required to pay following Genco's rejection of the Sublease.[7] Genco filed an objection to appellants' claims.

The Bankruptcy Court issued a decision disallowing appellants' claims in their entirety.[8] It held that Fisher-Park had not suffered any damages because it had continued to receive — from Fisher Management — the full rental amount previously paid by Genco.[9] It further held that Fisher Management did not have a claim for damages because it had received what it had bargained for under the Lease Documents — "the benefit of undisturbed occupancy, rather than [having to] face potential eviction . . . ."[10]

---

respective obligations (b) and Fisher Management will be responsible to the applicable Debtor for its respective obligations.").

[7]   *See* Bankr. Dkt. No. 462 at Ex. 5.

[8]   *See* Bankr. Dkt. No. 489 (the "Bankruptcy Court Opinion").

[9]   *See id.* at 5.

[10]  *Id.* at 6.

## II.     LEGAL STANDARD

A district court functions as an appellate court in reviewing orders entered by bankruptcy courts.[11]  Findings of fact are reviewed for clear error, whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[12]

## III.    APPLICABLE LAW

### A.     Lease Rejection and Claim Allowance

Under section 365(a) of the Bankruptcy Code, "subject to the court's approval, [the debtor-in-possession] may assume or reject any executory contract or unexpired lease of the debtor."  Subsection (g) states that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . . [which is deemed to occur] immediately before the date of the filing of the petition . . . ."  As explained by the Second Circuit:

> Rejection gives rise to a remedy for breach of contract in the non-debtor party.  The claim is treated as a pre-petition claim, affording creditors their proper priority.  Under sections 365(g) and 502(g), the date of breach is set as the date immediately prior

---

[11] *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993).

[12] *See In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).

>to the debtor's filing for bankruptcy. *See also* 4 Collier § 502.08[2]. The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor. However, the Code does not determine parties' rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law.[13]

>Section 502(g)(1) states that:

>A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

Section 101(5)(A) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." Under section 501(a), "a creditor . . . may file a proof of claim," and under section 502(a), such claim will be deemed allowed unless an objection is filed.[14] One basis for sustaining an objection and disallowing a claim is that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is

---

[13] *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) (citing *In re Yasin*, 179 B.R. 43, 50 (Bankr. S.D.N.Y. 1995)).

[14] When a claim is properly filed, it is prima facie evidence that the claim is valid. *See* Fed. R. Bankr. P. 3001(f).

contingent or unmatured . . . ."[15]  "Applicable law" most often refers to state law.[16]

### B.    Contract Interpretation

Under New York law, "[t]he court's function in interpreting a contract is to apply the meaning intended by the parties, as derived from the language of the contract in question."[17]  "[T]he best evidence of what parties to a written agreement intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning

---

[15]    11 U.S.C. § 502(b)(1).  Claim objections have a shifting burden of proof.  "To overcome the prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."  *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000).  If this is done, the burden shifts back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed."  *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12-civ-6074, 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  "In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure."  *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009).

[16]    *See Yasin*, 179 B.R. at 50 (stating that because "rejection constitutes a statutory breach, but does not repudiate or terminate the [contract,] [t]he parties must . . . resort to state law to determine their rights as a result of the breach"); *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006) (same).

[17]    *Marin v. Constitution Realty, LLC*, 11 N.Y.S.3d 550, 558-59 (1st Dep't 2015) (internal citations, quotations, and alterations omitted).

of its terms."[18]

"The question of whether a written contract is ambiguous is a question of law for the court."[19] "Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."[20] However, contract language is ambiguous if "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[21]

## IV. DISCUSSION

Appellants argue that because (1) section 365(g)(1) states that a rejection constitutes a breach and (2) it is axiomatic that a breach entitles the non-breaching party to a remedy (whether or not the governing contract specifically

---

[18] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations and quotations omitted).

[19] *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

[20] *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

[21] *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

provides for such remedy), they are entitled to damages.[22] Appellants concede "that common law damages for breach of contract are not recoverable where the contract at issue anticipates the possible occurrence of such breach and provides for a specific remedy in the event of such occurrence."[23] According to appellants, however, "there is nothing contained in any of the Lease Documents that even remotely contemplates a unilateral *breach* by Genco of the Sublease or disclaims damages therefor in the event such unilateral *breach* ever occurred."[24]

        According to the Bankruptcy Court, two provisions of the Lease Documents "compel[led] the conclusion that Genco is not obligated to pay any amounts sought in the two Claims."[25] The Bankruptcy Court believed that "[s]ection 2 of the SNDA specifically addresses the *exact* circumstances now before the Court. It makes clear that, where the Master Lease is *terminated*, but the subtenant [ ] stays in the premises, the subtenant must pay the full amount of the

---

[22]    *See* Mem. at 7, 9; Reply Brief of Appellants Fisher Brothers Management Co. LLC and Fisher-Park Lane Owner LLC ("Reply Mem."), at 1.

[23]    Reply Mem. at 3.

[24]    *Id.* (emphasis in original). The term "unilateral" is distracting; what appellants are really saying is that there is no clause in the Lease Documents addressing Genco's breach of the Sublease.

[25]    Bankruptcy Court Opinion at 5.

rent."[26]  The Bankruptcy Court also relied on section 5.1 of the Sublease, which provides that "[i]f the [Master Lease] shall *terminate* for any reason *this Sublease shall also terminate as of the date of the termination of the [Master Lease]*, unless [Fisher-Park] otherwise agrees, and in no event shall [Genco] be liable therefor."

However, the Second Circuit explains that "[w]hile rejection [under section 365(g)(1)] is treated as a *breach*, it does not completely *terminate* the contract.  Thus, rejection merely frees the estate from the obligation to perform; it does not make the contract disappear."[27]  It follows that the Master Lease (and the other Lease Documents) were not "terminated" solely by virtue of Genco's rejection of those agreements.  Accordingly, the Bankruptcy Court has either erred by equating rejection with termination or by failing to make a finding of fact that Genco terminated either the Master Lease or the Sublease.  As a consequence, it is unclear whether or not the termination language in section 2 of the SNDA and section 5.1 of the Sublease apply to this case.  Likewise, the Bankruptcy Court failed to address "breach" under section 365(g)(1) and whether and to what extent the Lease Documents contemplated a breach by Genco.

Because it is unclear from the Bankruptcy Court Opinion, and from

---

[26]    *Id.* (emphasis added).

[27]    *Lavigne*, 144 F.3d at 386-87 (emphasis added) (internal quotation marks and alterations omitted).

the order itself, to what extent the Bankruptcy Court relied on erroneous legal conclusions or findings of fact in ruling on the claim objections, the Bankruptcy Court's order must be vacated.[28] On remand the Bankruptcy Court is directed to address appellants' arguments — based on section 365(g)(1) and the Lease Documents — that the rejection of the Lease Documents "constituted . . . a breach of the Sublease by Genco, thereby entitling [ ] Fisher Management to damages arising from such breach."[29] In so doing, the Bankruptcy Court should consider the meaning of "breach" in section 365(g)(1), the interplay between such a breach and determining a claim under section 502(g)(1), and the defenses to liability for breach of a lease under New York law. The Bankruptcy Court is further directed to determine the damages, if any, arising from Genco's breach of the parties' agreements. In addition to the above, the Bankruptcy Court may address any other issues it deems necessary to resolving the claims objections.

## V. CONCLUSION

Accordingly, the Bankruptcy Court's order disallowing appellants' claims is VACATED and this matter is REMANDED to the Bankruptcy Court for

---

[28] *See In re Crystal Apparel, Inc.*, 207 B.R. 406, 411 (S.D.N.Y. 1997) (citing *Tekkno Labs. v. Perales*, 933 F.2d 1093, 1097 (2d Cir. 1991) ("[W]e will normally vacate the order if the findings and the record are not sufficient to enable us to be sure of the basis of the decision below.")).

[29] Reply Mem. at 1.

further proceedings consistent with this Opinion and Order. The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 3, 2015

## - Appearances -

**For Appellants Fisher Brothers Management Co. LLC and Fisher-Park Lane Owner LLC:**

Harvey A. Strickon, Esq.
Paul Hastings LLP
75 East 55th Street
New York, NY 10022
(212) 318-6380

**For Appellees Genco Shipping & Trading Limited, et al.:**

Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
Natan Hamerman, Esq.
Anupama Yerramalli, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100